## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **ADRIAN RODRIGUEZ ZAORAL,** | § | |
| | § | |
| **Plaintiff/Petitioner,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO.** |
| **JEYMORE GODOY MEZA,** | § | |
| | § | |
| **Defendant/Respondent.** | § | |
| | § | |
| | § | |

## VERIFIED COMPLAINT AND PETITION FOR THE RETURN OF THE CHILD UNDER THE HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER

This Verified Complaint and Petition is brought pursuant to the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention")[1] of October 25, 1980 and its implementing United States legislation, the International Child Abduction Remedies Act ("ICARA")[2]. Petitioner Adrian Rodriguez Zaoral seeks the return of his minor daughter to Venezuela, from where she was wrongfully removed under false pretenses by Respondent Jeymore Godoy Meza.

### THE PARTIES

1.    Petitioner Adrian Rodriguez Zaoral ("Mr. Rodriguez" or "Petitioner") is a citizen of Venezuela and currently resides at ███████████████████, Valencia, Carabobo State, Venezuela.

---

[1] Oct. 25, 1980, T.I.A.S. No. 11,670 at l, 22514 U.N.T.S. at 98, reprinted in 51 Fed. Reg. 10494 (1986).
[2] 22 U.S.C. §§ 9001–9011 (2012).

2.      Respondent Jeymore Godoy Meza ("Ms. Godoy" or "Respondent") is a citizen of Venezuela. Service will be effected on Respondent as required by law at ██████████, Houston, Texas 77043, where upon information and belief, Respondent resides with her sister, Morella Revollar.

## JURISDICTION

3.      This Court has jurisdiction over this case under 22 U.S.C. § 9003(a) (jurisdiction under ICARA) and 28 U.S.C. § 1331 (federal question jurisdiction) because this case involves the wrongful retention and removal of a child under the age of 16 from her habitual residence in Venezuela to the United States. United States District Courts "have concurrent original jurisdiction of actions arising under the Convention." *Cartes v. Phillips*, 240 F. Supp. 3d 669, 678 (S.D. Tex. 2017) (citing 22 U.S.C. § 9003(a)). Specifically, ICARA provides that "[a]ny person seeking . . . the return of a child. . . may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." 22 U.S.C. § 9003(b).

## VENUE

4.      Venue is proper under 22 U.S.C. § 9003 and 28 U.S.C. § 1391(b) because, upon information and belief, Respondent and the Child are residing with Respondent's sister, Morella Revollar, at ██████████, Houston, Texas 77043, in the Houston Division of the Southern District of Texas. A certified copy and translation of Respondent's request for judicial authorization and the order granting judicial authorization to travel are attached as Exhibit B and Exhibit C, respectively.[3]

_____

[3] Pursuant to ICARA, the Hague Convention's implementing United States legislation, exhibits referenced in this Verified Complaint do not require authentication for admissibility purposes. This

## I.   INTRODUCTION

5.   The Hague Convention established a framework to "secure the *prompt return* of children wrongfully removed to or retained in any Contracting State" outside the country of the child's habitual residence and "ensure that rights of custody and of access under the law of one Contracting State are *effectively respected* in other Contracting States."  Convention, Art. I (a)-(b) (emphasis added). On January 1, 1997, the Convention entered into force between the United States and Venezuela, making both contracting parties. *See* <u>Exhibit A</u>.

6.   The Convention was implemented by the United States Congress through the International Child Abduction Remedies Act ("ICARA"). 22 U.S.C. §§ 9001–9011. ICARA establishes the procedures for implementing the Convention in the United States in order to give effect to the Hague Convention within the United States.  *See Abbott v. Abbott*, 560 U.S. 1 (2010).

7.   The Hague Convention and ICARA are intended to restore the pre-abduction *status quo*, *i.e.*, return the child to the country of her habitual residence, and deter parents from crossing borders in search of a more sympathetic court in another country.  A United States District Court considering an ICARA petition has jurisdiction to decide only the merits of the wrongful removal or retention of a child. 22 U.S.C. § 9003; *see* <u>Exhibit A</u>, Art. 16. Once the child is returned to the country of habitual residence, the court there has jurisdiction to resolve custody and access matters,

---

is because ICARA provides a generous authentication rule to help expedite proceedings and waives Petitioner's burden to authenticate documents that are included with the Verified Petition. *See* 22 U.S.C. § 9005 ("With respect to any application to the United States Central Authority, or any petition to a court under section 9003 of this title, which seeks relief under the Convention, or any other documents or information included with such application or petition or provided after such submission which relates to the application or petition, as the case may be, *no authentication of such application, petition, document, or information shall be required in order for the application, petition, document, or information to be admissible in court.*") (emphasis added). All exhibits provided by Petitioner have certified English translations where applicable. In addition, Petitioner has provided Venezuelan court certified copies of Exhibits B–D, F, and I–N.

as needed. *See Abbott*, 560 U.S. at 9 ("A return remedy does not alter the pre-abduction allocation of custody rights but leaves custodial decisions to the courts of the country of habitual residence.").

8.     E.R.G. (the "Child") is fifteen years old and a citizen of Venezuela. She was wrongfully removed and retained in Houston, Texas, and away from her habitual residence in Venezuela.  The Child was born and raised in Valencia, Venezuela, attended school there, and was very close with her family and friends in Venezuela. Until she was about 11 years old, the Child lived with both her parents; when her parents separated in 2016, she was under joint custody of both parents. In June 2017, Mr. Rodriguez formally filed for a divorce, which was finalized in January 2018. Only four months later, on or around May 2018, Ms. Godoy sought permission to go to Houston, Texas, with the Child on what was supposed to be a five-week vacation. A Venezuelan court authorized her to take the Child to Houston *exclusively* for the purpose of vacationing and under the strict condition that the Child return on August 14, 2018.  On August 14, 2018, however, the Child did not return to Venezuela and was instead abducted by Ms. Godoy.

9.     On the date the Child was to return from Houston, her father, Mr. Rodriguez, was at the airport to pick up his daughter. But after waiting for hours, he discovered that his daughter never boarded the plane in Houston, and that Respondent had wrongfully abducted his daughter with no intention of returning the Child to Venezuela. Respondent continues to live with the Child in Houston in violation of Petitioner's custodial rights and Venezuelan court orders. This, despite the fact that before Respondent's departure, the Venezuelan court warned her that failure to return to Venezuela could constitute child abduction and was punishable by law.

10.     Immediately after the abduction, Mr. Rodriguez took swift action to ensure the return of his daughter through Venezuelan courts, which Ms. Godoy blatantly disregarded, and through the Hague Convention application process seeking the return of his only daughter. As a

result of her wrongful conduct, there is currently a Venezuelan arrest warrant for Ms. Godoy, which also led the Venezuelan Public Prosecutor's Office to request an INTERPOL Order of Capture seeking Respondent's return to Venezuela.

11.     Ms. Godoy has disregarded Mr. Rodriguez's custodial rights and wrongfully removed and retained the Child outside of Venezuela, the Child's habitual residence. Mr. Rodriguez seeks a final judgment establishing that the Child must be returned to Venezuela. Congress has declared that "[t]he international abduction or wrongful retention of children is harmful to their well-being. Persons should not be permitted to obtain custody of children by virtue of their wrongful removal or retention." 22 U.S.C. §§ 9001(a)(1)–(2). Given the clear, express legislative and Convention language, Petitioner implores the Court to uphold the obligations of the United States under the Convention by promptly securing the return of the Child to Venezuela.[4] *See* 22 U.S.C. § 9001(a)(3) ("International abductions and retentions of children are increasing, and only concerted cooperation pursuant to an international agreement can effectively combat this problem."); *see also Monasky v. Taglieri*, 140 S. Ct. 719, 719 (2020) (emphasis added) ("The Hague Convention . . . provides that a child wrongfully removed from her country of 'habitual residence' ordinarily *must* be returned to that country.").

---

[4] Currently, the Venezuelan government has suspended all international travel until May 12, 2020 due to COVID-19 concerns. There is a possibility that this date is extended. United States Virtual Embassy Venezuela, *COVID-19 Information*, https://ve.usembassy.gov/u-s-citizen-services/security-and-travel-information/covid-19-information/ ("On March 17, the Maduro regime suspended all international travel.  Land borders with Brazil and Colombia are closed. These restrictions were extended on April 12, 2020 for an additional 30 days.").

## II.  STATEMENT OF FACTS

### A.  The Child Was a Habitual Resident of Venezuela Until Her Wrongful Removal.

12.  The Child was born in Valencia, Carabobo State, Venezuela, to Mr. Rodriguez and Ms. Godoy. *See* <u>Exhibit D</u>. The Child spent her entire life in Valencia until her wrongful removal to the United States.

13.  The Child was very close with her father, family, and friends in Venezuela throughout her childhood. She frequently spent time with her family and friends, and would often go to cultural sites and beaches with her father. She spent time with her family almost every day, including her older brother Adrian, her cousins, grandparents, and her beloved dog, Tayron.

14.  The Child attended school at a highly regarded private school in Valencia called "Simon Bolivar Experimental Institute (APUCITO)" until the date of wrongful removal. *See* <u>Exhibit E</u>. She had many close friends at the Simon Bolivar Institute, many of whom she has known since the first grade. She loved her teachers at school. The Child struggled with a learning disability at a young age, and it was Mr. Rodriguez who was diligent about taking her to the doctor and helping her to overcome the disability. Mr. Rodriguez would pick up his daughter from school every day, and tutor and assist her with her homework. Mr. Rodriguez and the Child also worked together to help her overcome stage fright in order to achieve her dream of flourishing in school performances. In addition to attending school, the Child often participated in extracurricular activities such as volleyball and cooking classes.

15.  Sometime in January 2016, Mr. Rodriguez and Ms. Godoy separated. Until this separation, the Child lived with her parents and her older brother, Adrian, at their familial residence at Urb. El Trigal Sur, Calle Los Mijaos, Casa 88-81 Valencia, Carabobo State, Venezuela. After

the separation, Mr. Rodriguez moved out, and the Child continued to reside in this house with her mother and brother.

16.    During the period of separation, Mr. Rodriguez maintained his close relationship with the Child and continued to exercise his parental rights. Pursuant to an agreement between Mr. Rodriguez and Ms. Godoy, the Child stayed with Mr. Rodriguez every Tuesday night and every other weekend following the separation. The Child continued to receive tutoring from her father after school *every day* and Mr. Rodriguez spent time with her every other weekend.

**B.    Petitioner Persisted to Maintain his Relationship with the Child Despite Respondent's Retaliatory Measures After Petitioner Filed for Divorce in Venezuela**.

17.    In June 2017, Mr. Rodriguez formally filed for divorce. Ms. Godoy did not react well to this and, despite their custodial agreement, retaliated by making it increasingly difficult for Mr. Rodriguez to spend time with his only daughter. On several occasions, she would not let the Child stay with Mr. Rodriguez, and at other times, she began to restrict the amount of time he was able to spend with his only daughter.

18.    Ms. Godoy's conduct was in stark contravention to the custody arrangement to which she had agreed and which had worked just fine for over a year and-a-half since the Parties' separation. Ms. Godoy also denied the Child the benefit of receiving tutoring from her father, which Mr. Rodriguez had been providing every day prior to the divorce application. Indeed, Respondent restricted the father's access to his only daughter to such an extent that Mr. Rodriguez decided to buy his daughter a cellphone in order to communicate with her, because Ms. Godoy would not let him speak to the Child when he called the home phone. Despite these improper hindrances caused by Ms. Godoy, Mr. Rodriguez was diligent and committed to maintaining his close relationship with the Child; he spoke to her frequently on her cell phone, and tried to continue tutoring her as much as possible.

19.     On January 24, 2018, the Fourth Court of First Instance of Mediation, Execution and Substance ("the Fourth Court") in Valencia, Venezuela, issued the divorce decree formally dissolving the marriage of Mr. Rodriguez and Ms. Godoy. *See* Exhibit F. On that date, the Fourth Court granted Ms. Godoy primary custody of the Child and ordered Mr. Rodriguez to make child support payments. At the same time, the Fourth Court recognized Mr. Rodriguez's parental right over the Child by noting that the court's order was "in accordance with the provisions in the first part of Article 359 of the Organic Law for the Protection of Children and Adolescents." *See* Exhibit F at 6. By incorporating Article 359 in its order, the Fourth Court recognized that both parents "who exercise parental custody have a *shared, equal and inalienable duty* to exercise the Parenting Responsibility of their sons and daughters," and therefore decided that "all the contents of the Parenting Responsibility will continue to be *exercised jointly by the father and the mother*." *See* Exhibit G at 3 (emphasis added); Exhibit F at 5–6. The Fourth Court further recognized Mr. Rodriguez's parental rights when it required that Ms. Godoy "notify previously and in advance to [Mr. Rodriguez] in case she decides to change her residence, for the purposes that [Mr. Rodriguez] may fully exercise [his] rights and duties in relation to his daughter." Exhibit F at 6.

20.     Despite the Fourth Court's order, Respondent continued to deny Mr. Rodriguez the little time he was entitled to spend with his daughter, violating his right of access and ability to parent. *See* Exhibit F. Nevertheless, Mr. Rodriguez complied fully with his obligations, and until this day continues to make all required payments, including child support and tuition. Mr. Rodriguez also provided additional funds so that the Child could take cooking and music classes. Mr. Rodriguez was willing to take all steps necessary to ensure that his daughter had stability, a good education, and a father figure.

**C.**     **Respondent Requested and Was Given Judicial Authorization to Travel with the Child to Houston on a Five-Week Vacation**.

21.     In May 2018—about three months after the parties' divorce and joint custodial order—Ms. Godoy sought permission from Mr. Rodriguez to vacation to the United States with the Child to visit Ms. Godoy's sister who resides in Houston, Texas. Mr. Rodriguez did not want his daughter to travel abroad absent assurances that the Child would be guaranteed medical insurance and funds to protect her in case of a medical emergency. Ms. Godoy filed legal action to obtain permission through Venezuelan courts, seeking a Judicial Authorization to Travel Outside the National Territory ("Travel Authorization"). *See* Exhibit C. The Venezuelan court notified Ms. Godoy that if judicial authorization was granted in accordance with Venezuelan law, she would only be allowed to travel with the Child outside of Venezuela during pre-established dates and *exclusively* for the purpose of vacationing. *See* Exhibit C at 3. ("In this situation, it must be taken into account that the trip proposed by the custodial parent . . . constitute[s] a leisure trip . . . [i]n these agreements, a specific date, travel conditions and return date should be provided with regards to the departure from the Republic.").

22.     On July 4, 2018, the Third Court of First Instance for Mediation, Trial and Enforcement of the Judicial Circuit for the Protection of Children and Adolescents from the Judicial District of the State of Carabobo (the "Third Civil Court") approved the Travel Authorization. *See* Exhibit C. In the Travel Authorization, the Parties agreed to and stipulated that the Child was allowed to travel to the United States from July 6, 2018 to August 14, 2018 *exclusively* for the purpose of vacationing. *See* Exhibit C at 3–4. A round trip plane ticket was purchased for the Child by her maternal aunt in Houston, Texas to travel to Houston and return to Valencia, Venezuela on August 14, 2018, to begin spending her vacation time with her father.

23.     In the Travel Authorization, the Third Civil Court warned Ms. Godoy "that not complying with what has been ordered [] may be *understood as child abduction*, in accordance with the provisions of Article 3 of the [Hague Convention], which could originate a complaint before the Public Prosecutor's Office for the *criminal offense of contempt of court*, . . ., *as well as the procedure related to international return*." *See* Exhibit C at 4 (emphasis added). The Third Civil Court thus made Ms. Godoy fully aware that failure to comply was a form of child abduction actionable by the Hague Convention. To ensure that Ms. Godoy returned to Venezuela with the Child, the Third Civil Court ordered her to be present in court, "in the company of [the Child], between the hours of 08:30 AM and 03:30 PM during the week of 08/20/2018 to 08/24/2018," which was about a week after the Child was to return to Venezuela. *See* Exhibit C at 4.

24.     On July 6, 2018, Respondent and the Child flew to Houston. Mr. Rodriguez remained in contact with his only daughter by phone. He and the Child spoke almost every day through WhatsApp. In the meantime, Mr. Rodriguez paid the Child's school fees for the 2018–2019 school year and was eager for her to return home and spend vacation time with him and his family. Unbeknownst to Mr. Rodriguez, the Child would not return as scheduled.

**D.     The Child Was Abducted by Ms. Godoy When She Disobeyed the Venezuelan Court Order and Did Not Return with the Child to Venezuela.**

25.     On August 14, 2018, Mr. Rodriguez went to pick up his daughter from the Arturo Michelena International Airport in Valencia, Venezuela, where she was scheduled to arrive on Aruba Airlines Flight AG 111, as agreed to in the Travel Authorization. *See* Exhibit C at 4. Indeed, at the time the Third Civil Court entered its Travel Authorization on July 4, 2018, both the Third Civil Court and Mr. Rodriguez knew of the roundtrip ticket purchased for the Child by her maternal aunt and according to which, the Child was supposed to return by Aruba Airlines Flight AG 111 to Valencia.  The flight from Houston was scheduled to arrive between 2:00 PM to 2:30 PM. The

flight eventually arrived at 5:40 PM, but the Child was not on it. Mr. Rodriguez inquired with the proper authority only to find out that the Child never boarded the plane in Houston. Upon this realization, Mr. Rodriguez entered a state of severe emotional distress. From 5:30 PM until 7:40 PM, Mr. Rodriguez made several attempts to communicate with the Child by phone. At 7:46 PM, the Child responded in a message that she was fine, but would not provide any details about her location or circumstances. At that moment, Mr. Rodriguez realized that the Child was not returning to Venezuela, and that Ms. Godoy had abducted his only daughter and taken her to the United States under the false pretense of vacationing.

### E.      **Immediately After Mr**. **Rodriguez Realized That Respondent Abducted His Daughter, He Began Seeking Her Return**.

26.      In response to Respondent's abduction of his daughter, Mr. Rodriguez immediately began trying to communicate with Respondent in order to convince her to return the Child to Venezuela in compliance with the Third Civil Court's order. To this end, Mr. Rodriguez informed Ms. Godoy that if she did not return to Venezuela with the Child within 15 days, he would pursue legal means. Ms. Godoy hung up the phone on Mr. Rodriguez. Ms. Godoy and Mr. Rodriguez have not spoken since, despite several attempts by Mr. Rodriguez to get in touch with her. Therefore, Mr. Rodriguez decided to petition Venezuelan courts and authorities for help and, in parallel, sought relief through the Hague Convention process.

### 1.      **Mr**. **Rodriguez petitioned for help from Venezuelan courts and authorities**.

27.      On August 16, 2018, two days after the Child's abduction, Mr. Rodriguez reported the incident to the Public Ministry in Valencia, Venezuela—an independent institution in charge of public prosecutions. *See* Exhibit H.  Mr. Rodriguez's complaint was eventually handled by the Third Civil Court, in conjunction with the Venezuelan Public Prosecutor's Office in charge of protection of children and adolescents.

28.     The Third Civil Court instructed Mr. Rodriguez to exhaust his administrative remedies prior to the judicial procedure. Mr. Rodriguez followed the Third Civil Court's order; in the meantime, in November, 2018, Mr. Rodriguez contemporaneously filed his Hague Convention application with the Venezuelan Central Authority for the Convention, as discussed in greater detail below.

29.     On June 20, 2019, Mr. Rodriguez requested the Third Civil Court to hold Ms. Godoy in contempt of court for her violation of the Travel Authorization and request that the Public Prosecutor pursue a case against Ms. Godoy for committing a crime against the public order. *See* Exhibit I at 4–5.

30.     On September 19, 2019, the Third Civil Court granted Mr. Rodriguez's request and notified the Public Prosecutor's Office of Ms. Godoy's non-compliance with the Travel Authorization, requesting that the Public Prosecutor's Office "initiate proceedings to open an investigation regarding the non-compliance by the citizen previously identified." Exhibit J at 2. In the same order, the Third Civil Court also held Ms. Godoy in criminal contempt for her violation of the Travel Authorization by not returning to the Venezuela on the prescribed date (*i.e.* August 14, 2018). *Id.*

31.     The Public Prosecutor's Office conducted an investigation and on October 23, 2019, recommended with "URGENCY" that the Criminal Judicial Circuit from the State of Carabobo Third State and Municipal Court of First Instance (the "Third Criminal Court") indict Ms. Godoy for crimes against the public order. *See* Exhibit K. In response to the Prosecutor's Office urgent request, the Third Criminal Court also scheduled an indictment hearing for Ms. Godoy for November 4, 2019, for committing a crime against the public order. *See* Exhibit L at 1. Ms. Godoy did not appear before the Third Criminal Court.

32.     Given Ms. Godoy's continuous failure to comply with Venezuelan court orders, the Public Prosecutor's office requested that the Third Criminal Court issue an arrest warrant for Ms. Godoy for crimes against the public order. *See* <u>Exhibit M</u>. On November 12, 2019, the Third Criminal Court issued an arrest warrant for Ms. Godoy for crimes against the public order. *See* <u>Exhibit N</u> at 1.

33.     On February 11, 2020, in response to Ms. Godoy's evasion of the Venezuelan arrest warrant, the Public Prosecutor's Office requested an INTERPOL Order of Capture for the capture of Ms. Godoy. *See* <u>Exhibit O</u>. The order requests that Ms. Godoy be placed into INTERPOL's "Search and Arrest" notification system, classifying her as "RED code for the purpose of Extradition of the citizen," which is a notice requesting "law enforcement worldwide to locate and provisionally arrest a person pending extradition, surrender, or similar legal action."[5]

34.     Despite all the Venezuelan court proceedings, orders, and an arrest warrant, Ms. Godoy is still at large.

> **2.     Simultaneous to the Venezuelan proceedings, Mr. Rodriguez filed an application under the Hague Convention.**

35.     Given Ms. Godoy's flagrant disregard of Venezuelan law and orders from the Venezuelan courts, Mr. Rodriguez approached the Venezuelan Ministry of Foreign Affairs—the Venezuelan Central Authority for the Hague Convention—to use an international avenue for the return of his daughter. The Venezuelan Central Authority advised him to complete an application for the return of the Child under the Convention. On November 11, 2018, Mr. Rodriguez filed this application for the return of his daughter. After accepting his application, the Venezuelan Central Authority then forwarded the application on December 26, 2018, along with all corresponding

---

[5] INTERPOL, *Red Notices*, interpol.inten/How-we-work/Notices/Red-Notices.

documents, to the United States Department of State – the United States Central Authority for the Hague Convention. *See* <u>Exhibit P</u>.

36.     On January 23, 2019, the United States Department of State sent Ms. Godoy a letter informing her of the Convention application filed for the return of the Child. *See* <u>Exhibit Q</u>. Given that Ms. Godoy remains at large, with no regard for the law or Mr. Rodriguez's parental rights, Mr. Rodriguez seeks relief from this United States District Court.

37.     Meanwhile, since her abduction, the Child is missing out on critical time at school, her family, and lifelong friends in Venezuela.

## III.    LEGAL STANDARD

38.     In accordance with the Hague Convention and ICARA, the Convention's implementing legislation, the Supreme Court has instructed district courts (1) to remedy a child's wrongful removal by ordering the return of the child to her habitual residence, and (2) to act expeditiously to provide this remedy. *See* Convention, Art. I (a)-(b) (describing the purpose of the Convention as to "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States," and "secure the prompt return" of wrongfully removed children); *Abbott*, 560 U.S. at 4 (instructing courts in Hague Convention cases to rule in "accord[ance] with the Convention's objects and purposes").

39.     The Supreme Court has mandated that wrongful removal cases brought by non-custodial parents be treated as vigorously as other cases to avoid legitimizing child abduction and ensure deterrence of child abduction:

> *To interpret the Convention to permit an abducting parent to avoid a return remedy, even when the other parent holds a [noncustodial right], runs counter to the Convention's purpose of deterring child abductions to a country that provides a friendlier forum. Denying such a remedy would legitimize the very action, removal of the child, that the Convention was designed to prevent, while requiring return of the child in cases like this one helps deter abductions and respects*

> the Convention's purpose to prevent harms to the child resulting
> from abductions.

*Abbott*, 560 U.S. at 4 (internal citation omitted).

**A.   Per the Convention and ICARA, Petitioner Is Entitled to a Return Remedy Because His Minor Daughter Was Wrongfully Removed.**

40.      ICARA and the Supreme Court explain that Petitioner's *only* burden for the prompt return of his Child is to prove that the Child was wrongfully removed. *See* 22 U.S.C. § 9001(a)(3) ("Children who are wrongfully removed or retained within the meaning of the Convention *are to be promptly returned* unless one of the narrow exceptions set forth in the Convention applies.") (emphasis added); *see also Abbott*, 560 U.S. at 5 ("The Convention provides that 'a child abducted in violation of rights of custody *must* be returned to the child's country of habitual residence, unless certain exceptions apply.'") (emphasis added).

41.      Consistent with Article 3 of the Convention, the United States Court of Appeals for the Fifth Circuit has held that the removal or the retention of a child is wrongful where (1) "the respondent removed or retained the child somewhere other than the child's habitual residence"; (2) "the removal or retention violated the Petitioner's 'rights of custody' under the habitual residence nation's laws"; and (3) "at the time of removal or retention, those rights were actually [being] exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Cartes*, 240 F. Supp. 3d at 678–79 (citing *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012)); *see also* Convention, Art. 3.  Here, each of these three criteria is satisfied, and therefore, Petitioner has established his *prima facie* case to seek the return of his only daughter.

**1.   The Child was a habitual resident of Venezuela at the time of the wrongful removal.**

42.      Petitioner incorporates here Paragraphs 12–16 and 22–25 set forth above. Respondent removed and retained the Child from her habitual residence in Venezuela. *See* ¶¶ 12–

16. The Child was a habitual resident with Petitioner in Venezuela immediately before her removal and retention by Respondent because she was "at home" in Venezuela. *Monasky*, 140 S. Ct. at 719 ("The Convention does not define 'habitual residence,' but, as the Convention's text and explanatory report indicate, a child habitually resides where she is at home."). The Fifth Circuit has "adopted an approach that begins with the parents' shared intent or settled purpose regarding their child's residence." *Larbie v. Larbie*, 690 F.3d 295, 310 (5th Cir. 2012) (citing *Nicolson v. Pappalardo*, 605 F.3d 100, 104 (1st Cir. 2010)). This test examines "whether *both* parents intended for the child to abandon the habitual residence left behind." *Larbie*, 690 F.3d at 310–11 (5th Cir. 2012) (citing *Mozes v. Mozes,* 239 F.3d 1067, 1075 (9th Cir. 2001)) (emphasis added).

43.     As set forth above, the Child was born in Valencia, Venezuela, and lived there until her wrongful removal by Respondent. The Child attended school in Venezuela and was very close with her family and friends. Although Respondent obtained permission from a Venezuelan court to bring the Child to Houston, Texas, the Travel Authorization explicitly provided that the Child could travel *solely* for the purpose of vacationing and ordered the Child's return on August 14, 2018. The Venezuelan court even required Respondent to be present in court with the Child the week after their scheduled return. *See* ¶ 23. The Venezuelan court order makes it blatantly clear that the Parties did not intend for the Child's place of residence to change. *See Larbie*, 690 F.3d at 311 ("Notably, when the child's initial move from an established habitual residence was clearly intended to be for a specific, limited duration[,] ... most courts will find no change in habitual residence."). Indeed, Mr. Rodriguez, the non-custodial parent who retains parental rights under Venezuelan law, never acquiesced or consented to the Child's permanent removal from Venezuela. Thus, the Child was wrongfully removed and retained from her habitual residence of Venezuela.

**2.      Petitioner's rights of custody were violated when Respondent retained the Child to live in Houston, Texas, without Petitioner's acquiescence and in violation of Venezuelan court order.**

44.      Petitioner incorporates here Paragraphs 16–37 set forth above. The Child's wrongful removal violated Petitioner's right of custody under the applicable and governing Venezuelan law, and court orders. *See* ¶¶ 16–35. Petitioner's right to determine the Child's place of residence constitutes his right of custody under the Convention and Supreme Court precedent. Convention, Art. 5 (defining right of custody as "includ[ing] rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.");  *See Abbott*, 560 U.S. 1 (finding that if a non-custodial parent has the right to determine the child's place of residence in the parent's respective State, then that parent has a right of custody as required by the Convention and may seek a return remedy, under the Convention, as implemented by ICARA.)

45.      Respondent violated the Third Civil Court's order in the Travel Authorization when she did not return with the Child on August 14, 2018 back to Venezuela. *See* ¶¶ 22–25, 32. Likewise, she disobeyed the Third Civil Court by not appearing before it the week after her scheduled return. *See id*. Respondent's actions blatantly violated the Parties' custody agreement and the Venezuelan court order, which required Respondent to "notify previously and in advance to [Mr. Rodriguez] in case she decides to change her residence, for the purposes that [Mr. Rodriguez] may fully exercise [his] rights and duties in relation to his daughter." *See* Exhibit F at 6. Respondent has never provided Mr. Rodriguez with any such notification. Even if she had, Petitioner never consented or acquiesced to the Child living in Houston, Texas, and therefore, Respondent is violating Petitioner's right of custody by retaining the Child in Houston.

46.      Respondent has furthermore robbed Petitioner of his right to parent his child under Venezuelan law. As set forth above, under Article 359 of the Venezuelan Organic Law for the Protection of Children and Adolescents, both parents "who exercise parental custody have a

shared, equal and inalienable duty to exercise the Parenting Responsibility of their sons and daughters." <u>Exhibit G</u> at 3. This right was explicitly recognized in the Parties' custody agreement, as entered by the Venezuelan court. <u>Exhibit F</u> at 6. Therefore, the Child's wrongful removal to Houston, Texas violated Petitioner's right of custody under Venezuelan law—a fact that has been confirmed by the numerous Venezuelan court orders.

>**3.  Petitioner was actually exercising his custody rights and, but for Respondent's removal and retention of the Child, Petitioner would have continued to exercise those rights.**

47.     Petitioner incorporates here Paragraphs 13–37 set forth above. At the time of the Child's wrongful removal from Venezuela, Petitioner was actually exercising his custody rights and, but for Respondent's removal and retention of the Child, Petitioner would have continued to exercise those rights. As set forth above in Paragraphs 16–26, before the wrongful removal, Petitioner spent as much time with his daughter as allowed by the custody agreement, notwithstanding Respondent's interference. Mr. Rodriguez was also diligent and committed to maintaining his close relationship with the Child, and complied with his financial obligations under the custody agreement.  Even after the Child's abduction, Petitioner has continued to exercise his parental right by seeking the Child's return through Venezuelan courts and now through the Hague Convention application process. To this day, Petitioner continues to make all of the payments required by the custody agreement, including child support and tuition.

48.     For the foregoing reasons, Petitioner has satisfied all three elements to establish the *prima facie* case, and therefore, a return remedy is warranted in this case.

>**B.  To Ensure the Prompt Return of the Child, Applicable Law Requires Expeditious Proceedings and a Decision on the Petition Within Six Weeks.**

49.     Congress has implemented ICARA to ensure quick and decisive action in cases of international abduction per the Convention. 22 U.S.C. § 9001(a)(4). The aim of these laws is the

"prompt return of children who have been wrongfully removed or retained." *Id*. This is because "[p]rompt resolution of international child abduction cases is essential to safeguarding the best interests of the child and upholding the core spirit of the Convention." *Hernandez v. Garcia Pena*, 820 F.3d 782, 790 n. 7 (5th Cir. 2016) (citing *Chafin v. Chafin,* 568 U.S. 165, 179 (2013)) ("[W]hether at the district or appellate court level, courts can and should take steps to decide these cases as expeditiously as possible, for the sake of the children who find themselves in such an unfortunate situation."). Additionally, the Convention instructs Contracting States to "use the most expeditious proceeding available" and courts to "act expeditiously in proceedings for the return of the [child]." Convention, Art. 2, 11.

50.     The Supreme Court has instructed district courts to "take steps to decide these cases as expeditiously as possible," *Chafin*, 568 U.S. at 179, in part because the Convention states that a petition for return of an abducted child shall be determined expeditiously, preferably "*within six weeks from the date of commencement of proceedings*." Convention, Art. 11 (emphasis added). The Convention permits Mr. Rodriguez or the Venezuelan Central Authority of the Requesting State to seek an explanation of "reasons for the delay" if the judicial or administrative authority in the Requested State has not reached a decision within six weeks from the date proceedings commenced. *Id*.

51.     The Convention therefore gives this United States District Court broad discretion to expedite Convention cases. *See* Convention, Art. 11; *Sanchez v. R.G.L.*, 761 F.3d 495, 500 (5th Cir. 2014) ("Because Hague Convention petitions are intended to be addressed expeditiously, the district court held an evidentiary hearing one month after [Petitioner] filed her suit.").

## IV.    TEMPORARY RESTRAINING ORDER

52.     Petitioner incorporates all the previous paragraphs as if alleged herein.

53.     Petitioner seeks an immediate temporary restraining order under Federal Rule of Civil Procedure 65(b) to prevent the removal of the Child from this Court's jurisdiction. Such an Order is consistent with ICARA, which empowers United States District Courts to take any appropriate measures "to prevent the child's further removal or concealment before the final disposition of the petition." 22 U.S.C. § 9004(a).

54.     Courts often grant temporary restraining orders in Hague Convention where the removing parent has already defied court orders by wrongfully retaining the child in a foreign country because they are considered a flight risk. *See Ortiz v. Cantu*, No. 4:09-cv-02913 at Doc. 8 (S.D. Tex. Dec. 7, 2009); *Garcia v. Contreras,* No. 3:13-cv-2609, 2013 WL 12100779 (N.D. Tex. Jul. 12, 2013); *Jaimes Sierra v. Tapasco,* No. 4:15-cv-00640, 2016 WL 5402933 (S.D. Tex. Sept. 28, 2016). Given that Respondent has already defied Venezuelan court orders with respect to her wrongful removal of the Child, Respondent poses a significant flight risk and therefore the temporary restraining order is necessary to preserve the *status quo*, protect the Petitioner's rights under the Convention and ICARA; and prevent irreparable harm to Petitioner.

### A.    Petitioner Satisfies the Four Elements Required to Obtain a Temporary Restraining Order.

55.     Petitioner must prove four elements to obtain a temporary restraining order. *See Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). In this case, Petitioner satisfies each of the four elements.

56.     <u>First</u>, Petitioner is substantially likely to ultimately prevail on the merits. Mr. Rodriguez will likely succeed on the merits of this Petition because, as detailed above, (1) the Child was a habitual resident of Venezuela prior to her wrongful removal, (2) Mr. Rodriguez had

custodial rights under Venezuelan law, and (3) Mr. Rodriguez was actually exercising those custodial rights at the time of the Child's removal. *See supra* Section III(A).

57.     <u>Second</u>, Petitioner will suffer irreparable injury unless equitable relief is granted. Unless this Court grants the temporary restraining order, Respondent is likely to once again flee with the Child, as she previously did when she wrongfully removed and retained the Child away from her habitual residence in Venezuela to Houston. If Respondent flees with the Child, Mr. Rodriguez will lose his right under the Hague Convention and its implementing legislation ICARA for the *prompt* return of his child. In addition, it will be difficult, if not impossible to locate Respondent and the Child before the Child turns 16 in January 2021. This means that Mr. Rodriguez will also lose his right under the Hague Convention and ICARA—which only apply to children under 16 years of age—to petition a court seeking the return of his daughter.

58.     <u>Third</u>, the threatened injury to Petitioner outweighs any damage an injunction may cause the Respondent. As demonstrated above, a temporary restraining order is required in this case because Respondent is a significant flight risk. If she flees this Court's jurisdiction, Mr. Rodriguez will lose his right to the prompt return of his child and may also lose his right to proceed under the Hague Convention. Mr. Rodriguez merely seeks the *status quo* prior to the wrongful abduction: the ability to exercise his right of custody in Venezuela, the Child's habitual residence. In contrast, granting the requested relief merely prevents Respondent from leaving this Court's jurisdiction for a short period of time. *See Ortiz v. Cantu*, No. 4:09-cv-02913 at Doc. 8 (S.D. Tex. Dec. 7, 2009) (interpreting the Hague Convention and ICARA to hold that the harm to a father of potentially never seeing his daughter again due to the risk of the mother fleeing the jurisdiction outweighed the harm caused to mother by taking temporary custody of the child pending the resolution of the merits).

59.     Fourth, granting the preliminary injunction is not adverse to the public interest. The relief Mr. Rodriguez seeks is authorized under the Hague Convention, and consistent with federal and state law implementing the Convention. Indeed, this lawsuit was referred to Mr. Rodriguez's counsel by the United States Department of State which facilitates the proper implementation of the Hague Convention in the United States. Invoking United States law as such cannot be adverse to the public interest. *See Garcia v. Contreras,* No. 3:13-cv-2609, 2013 WL 12100779 at 2 (N.D. Tex. Jul. 12, 2013) (interpreting the Hague Convention and holding that granting a temporary restraining order is not adverse to the public interest).

**B.      The Security or Bond Requirement Should Not Apply Here or Should be Nominal.**

60.     Federal Rule of Civil Procedure 65(c) provides that a temporary restraining order may be issued "only if the movant gives security in an amount that the court considers proper…" Fed. R. Civ. P. 65(c).  ICARA empowers this Court to "take or cause to be taken measures under Federal or state law, as appropriate, to protect the well-being of the child involved or to prevent the child's further removal or concealment before the final disposition of the petition." 22 U.S.C. § 9004(a). In granting this broad power, ICARA makes no reference to any security or bond requirement. Courts have previously waived the security requirement outright in Hague Convention cases. *See Alanis v. Reyes*, No. 3:16-cv-00268-GHD-RP, 2017 U.S. Dist. LEXIS 3141 (N.D. Miss. Jan. 9, 2017).

61.     Alternatively, Petitioner respectfully submits that given the circumstances of this case, the proper bond required, if any, should be nominal. In *Morgan v. Morgan*, the district court recognized the unique circumstances for temporary restraining orders in Hague Convention cases and required that only a nominal bond be posted. 289 F. Supp.2d 1067, 1070 (N.D. Iowa 2003).

## V.   CONSLIDATE EXPEDITED PRELIMINARY INJUNCTION HEARING WITH TRIAL ON THE MERITS

62.   Petitioner seeks an expedited preliminary injunction hearing pursuant to Federal Rule of Civil Procedure 65(b)(3). Petitioner requests that this Court consolidate this preliminary injunction hearing with the trial on the merits of the Verified Complaint pursuant to Federal Rule of Civil Procedure 65(a)(2).

## VI.   ATTORNEYS' FEES AND COSTS (22 U.S.C. § 9007)

63.   To date, Petitioner has incurred attorneys' fees and costs as a result of the wrongful retention of the Child by Respondent. Petitioner respectfully requests that this Court award him all costs and fees, including transportation costs, incurred to date as required by 22 U.S.C. § 9007.

## VII.   NOTICE OF HEARING (22 U.S.C. § 9003)

64.   Pursuant to 22 U.S.C. § 9003(c), Respondent shall be given notice of these proceedings in accordance with the laws governing notice in interstate child custody proceedings.

## VIII.   RELIEF REQUESTED

65.   Petitioner therefore respectfully asks this Court to:

(a)   Enter a final judgment in Petitioner's favor establishing that the Child shall be returned to Venezuela, where an appropriate custody determination can be made by a Venezuelan court under Venezuelan law;

(b)   Grant the Petitioner an immediate hearing on the temporary restraining order;

(c)   Grant Petitioner's temporary restraining order under Federal Rule of Civil Procedure 65(b) prohibiting the removal of the Child from this jurisdiction;

(d)   Order that the security or bond requirement for the temporary restraining order either not apply here or that the amount required be nominal;

(e)     Schedule an expedited preliminary injunction hearing to determine that the temporary restraining order should be extended pending the determination of the merits of the Verified Complaint;

(f)     Order the Respondent to tender her and the Child's passports and visas to the Court for the duration of this proceeding at the time she is served with this action;

(g)     Schedule an expedited hearing on the merits of the Verified Complaint;

(h)     Pursuant to Federal Rule of Civil Procedure 65(a)(2), issue an Order that the hearing on the merits of the Verified Complaint be advanced and consolidated with the preliminary injunction hearing;

(i)     Enter an Order requiring that Respondent pay Petitioner's expenses and costs, including transportation costs, under 22 U.S.C. § 9007, such expenses and costs to be resolved via post-judgment motion; and

(j)     Any such further relief as may be just and appropriate under the circumstances of this case.

Dated: May 14, 2020

Respectfully submitted,

By:  */s/ Paula W. Hinton*
      Paula W. Hinton
      Texas State Bar No. 09710300
      S.D. Adm. No. 6283
      WINSTON & STRAWN LLP
      800 Capitol St., Suite 2400
      Houston, TX 77002
      Telephone: (713) 651-2600
      Facsimile: (713) 651-2700
      Email: phinton@winston.com

      Attorney-in-Charge *for Petitioner*
      *Adrian Rodriguez Zaoral*

OF COUNSEL:

M. Imad Khan
Texas State Bar No. 24079736
S.D. Adm. No. 1419011
WINSTON & STRAWN LLP
800 Capitol St., Suite 2400
Houston, TX 77002
Telephone: (713) 651-2600
Facsimile: (713) 651-2700
Email: ikhan@winston.com

Rachel A. Busch (*Pro Hac Vice Pending*)
CA Bar 327939
Yarden Z. Kakon (*Pro Hac Vice Pending*)
CA Bar 328800
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA  94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
Email: rbusch@winston.com
Email: ykakon@winston.com

Attorneys *for Petitioner*
*Adrian Zaoral Rodriguez*

**VERIFICATION[1]**

I, Adrian Rodriguez Zaoral, solemnly declare and affirm under the penalties of perjury and the laws of the United States of America, that the contents of the foregoing Petition are true to the best of my knowledge, information and belief.

Executed on: May 14, 2020

/s/   _____

Adrian Rodriguez Zaoral

---

[1] *See, attached as* Exhibit R, Petitioner's signature on an unofficial Spanish translation of the Verification. Petitioner reviewed an unofficial Spanish translation of the instant Complaint because he does not speak English. Undersigned counsel can provide a copy of said unofficial Spanish translation if the Court would like this information in the record.

Escaneado con CamScanner