United States District Court
Southern District of Texas
**ENTERED**
August 26, 2020
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| ADRIAN RODRIGUEZ ZAORAL, | § |
| | § |
| Plaintiff/Petitioner, | § |
| | § |
| V. | § |
| | § |
| JEYMORE GODOY MEZA, | § |
| | § |
| Defendant/Respondent. | § |
| | § |

CIVIL ACTION NO. H-20-1700

**FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

This case was tried to the court on August 9, 10, and 11, 2020.  Pursuant to Federal Rule

of Civil Procedure 52(a)(1), the court makes the following findings of fact and conclusions of law.

**I.      FINDINGS OF FACT**

1.      Petitioner, Adrian Rodriguez Zaoral, is a dual citizen of Spain and Venezuela.

PX 03 at ZAORAL 061; PX 05 at ZAORAL 073; Joint Pretrial Order, Parties' Admissions of Fact

(ECF 53-01), at ¶ 1.

2.      Petitioner attended and graduated from the University of Carabobo in Valencia,

Venezuela.

3.      Petitioner currently works as the general manager of his family's company, IMICA,

in Valencia, Venezuela.  He has held this position for approximately fifteen years.

4.      Petitioner owns two houses in Venezuela, including the house located at Urb.

El Trigal Sur, Calle Los Mijaos, Casa 88-81, Valencia, Carabobo State, Venezuela.

5.     Respondent, Jeymore Godoy Meza, is a citizen of Venezuela.  PX 02 at ZAORAL 011; PX 05 at ZAORAL 073; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 2.

6.     Petitioner and Respondent were legally married on October 22, 1995.  Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 3.

7.     The Parties' daughter, E.R.G., was born on January 26, 2005, in Valencia, Venezuela, and lived her entire life in Venezuela before coming to Houston, Texas, on July 6, 2019.  PX 03 at ZAORAL 061; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 4.  She lived in the family home in Valencia for most of that time.

8.     E.R.G. is a dual citizen of Spain and Venezuela.  Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 5.

9.     The Parties have an older son, Adrian Jesus Rodriguez Godoy ("Adrian Jr."), who is twenty-four years old and lives at the family residence at Urb. El Trigal Sur, Calle Los Mijaos, Casa 88-81, Valencia, Carabobo State, Venezuela.

10.     E.R.G. grew up in her family home in the El Tigal neighborhood of Valencia – Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 12.  The home is a well-appointed, two-story edifice located in a gated community and is equipped with an electric generator and security features, including an electric fence, surveillance system, and infrared sensor alarms.  PX 44.

11.     Growing up in Venezuela, E.R.G. was provided with food, clothing, medical care, and support from friends and family members.  PX 25; PX 38; PX 39; PX 40; PX 44.

12.     E.R.G. consulted with doctors in Venezuela including a dermatologist, neurologist, pediatrician, dentist, and psychologist.  PX 38; PX 39; PX 40.

13.      In Venezuela, E.R.G. had close relationships with her father, other family members, and friends.

14.      During her childhood in Venezuela, E.R.G. frequently spent time with her family, including her brother Adrian Jr., parents, grandparents, cousins, and her dog, Tayron.  Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 6.

15.      E.R.G. had many friends in Venezuela.  Her best friend, Sophia, lives in Valencia, Venezuela.

16.      E.R.G. attended a highly regarded school, "Simon Bolivar Experimental Institute (APUCITO)," in Valencia, Venezuela.  Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 9.  She attended this school for eight years from the Kindergarten until her removal to Houston, Texas.

17.      Adrian Jr., E.R.G.'s older brother, also attended and graduated from APUCITO and currently attends the University of Carabobo, where he is a student studying bioscience.

18.      When she was six years old E.R.G. was diagnosed with and received treatment in Venezuela for Attention Deficit Disorder ("ADD"), short term memory deficits, difficulty in concentration and learning, and neurological sympathetic hyperactivity syndrome with a hypoactive sympatho-adrenal system.  PX 39 at ZAORAL 380-82; PX 40 at ZAORAL 394.

19.      Before the parties separated Petitioner sometimes tutored E.R.G. and worked with her to assist her with homework.  Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 7.  Petitioner also paid tutors to assist E.R.G. with her school work.  Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 8.

20.      E.R.G. participated in extracurricular activities in Venezuela, including soccer (football) and cooking classes.

21.     E.R.G. went on vacations with Petitioner before her removal to Houston.

22.     In January of 2016 the Parties separated. Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 11.

23.     After the separation Petitioner moved out of the family home while Respondent and their children continued to reside there.

24.     Following the separation E.R.G. stayed with Petitioner Tuesday nights and every other weekend pursuant to an agreement between the Parties. Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 15. Petitioner usually picked E.R.G. up from school on Tuesday afternoon. Sometimes Petitioner was late, and E.R.G. would have to wait for him.

25.     E.R.G. sometimes received tutoring from her father after school.

26.     After the separation Petitioner continued spending time with E.R.G., including taking her to get ice cream and to the movies.

27.     Petitioner filed for divorce from Respondent on June 22, 2017. Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 16.

28.     On January 24, 2018, the Fourth Court of the First Instance of Mediation, Execution and Substance ("the Fourth Court") in Valencia, Venezuela, issued the divorce decree formally dissolving the marriage of the Parties and declaring their rights and obligations regarding E.R.G. ("Divorce Decree"). PX 05; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶¶ 17, 19, 20.

29.     The Divorce Decree gave Respondent primary custody of E.R.G. PX 05 at ZAORAL 073, 076. However, the Divorce Decree did not permit Respondent to unilaterally move E.R.G., since it required Respondent to "notify previously and in advance [Petitioner] in case she decides to change her residence, for the purposes that [Petitioner] may fully exercise [his] rights

and duties in relation to his daughter." PX 05 at ZAORAL 076; Joint Pretrial Order, Parties'

Admissions of Fact (ECF 53-01), at ¶ 21.

      30.    The Divorce Decree awarded the Petitioner three separate custodial and parental

rights:

1. A joint right of parental responsibility (PX 05, ZAORAL 075-76 (emphasis added)):

   SECOND: The PARENTAL RESPONSIBILITY, which implies the set of duties and rights of both parents in relation to their children, which has as its object the care, development and integral education of E.R.G., as well as the Responsibility of Crianza, the Representation and the Administration of The Assets *will be exercised jointly* by both parents, in interest and the adolescent, in accordance with the provisions of articles 347, 348 and 349 of the Organic Law for the Protection of Children and Adolescents.

   THIRD. RESPONSIBILITY OF FOSTERING, which includes the duty and shared right, equal and inalienable of the father and mother to love, raise, train, educate, guard, monitor, maintain and assist materially, morally and affectively their sons and daughters, as the faculty of applying adequate corrective measures that do not violate their dignity, rights, guarantees or integral development, *will be exercised jointly by both parents in relation to children*, in accordance with what is established in articles 358 and heading 359 of the Law Organic for the Protection of Children and Adolescents.

2. A right to have custody of E.R.G. on Tuesdays, every other weekend (incorporated by reference into the divorce decree), and one-half of holiday vacation (PX 05, ZAORAL 073-74, 077 (emphasis added)):

   Well, in this regard, establishes the aforementioned sentence that: . . . the divorce applications of mutual consent submitted by both spouses, with no other requirements than the marriage and birth certificate of the children and adolescents in question, *as well as the prior agreement of the spouses* about the family institutions, that is, the relative responsibility for the upbringing of minors who had procreated, the responsibility of custody, maintenance obligation and family coexistence regime, in order to be evaluated by the Judge of children and adolescents and determine if they are suitable for children. girls or teenagers in question and confer the homologation, in case it is not, the Judge will order its correction. The homologation of the family institutions will be a necessary requirement for the declaration of divorce . . .

*    *    *

> In holiday seasons such as carnival, Easter, school holidays, December holidays will be shared by both parents taking into account the opinion of the teenager.

3. A right to be notified previously and in advance when Respondent decided to change her residence (PX 05, ZAORAL 076) (emphasis added):

> In relation to the CUSTODY of the adolescent EVA GABRIELA RODRIGUEZ GODOY, born on January 26, 2005 of twelve (12) years of age she will live with her mother the citizen JEYMORE GODOY MEZA, in such sense, this court rules that the Custody will be exercised by the mother. She *must notify previously and in advance to the other parent* in case she decides to change her residence, for the purposes that [Petitioner] may fully exercise [his] rights and duties in relation to his daughter, in accordance with the provisions in the first part of article 359 of the Organic Law for the Protection of Children and Adolescents.

31.     Pursuant to the Divorce Decree, Petitioner was ordered to financially support E.R.G. by providing one million Venezuelan Bolivars (Bs. 1,000,000) per month, 50% of her school tuition, 50% of her school supplies, clothing, medical care, food, and toiletries. PX 05 at ZAORAL 076–77; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 22.

32.     Petitioner met his obligations as decreed under the Divorce Decree. PX 21; PX 22; PX 24; PX 25; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 50.

33.     On April 12, 2018, the Fourth Court officially entered the Divorce Decree. PX 05 at ZAORAL 080-82; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 18.

34.     In May of 2018 Respondent requested permission from Petitioner to take E.R.G. on a five-week vacation to visit E.R.G.'s aunt, Morella Revollar, in Houston, Texas. Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 23.

35.     On May 23, 2018, Respondent submitted a signed request to the Third Court of First Instance for Mediation, Substantiation and Execution, Judicial Circuit for Protection of the Children and Adolescents of the Carabobo State seeking authorization to travel with E.R.G. to

- 6 -

Houston, Texas, for a five-week vacation from July 6 to August 14, 2018.  PX 01; Joint Pretrial

Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 25.

36.     On July 4, 2018, the Third Court of First Instance for Mediation, Trial and

Enforcement, Judicial Circuit for the Protection of Children and Adolescents, of the Judicial

District of the Carabobo State ("Third Civil Court") granted Respondent's request and

memorialized the Parties' agreement into an order granting travel authorization (the "Travel

Authorization").  PX 02; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 26.

37.     The Third Civil Court informed Respondent that the Travel Authorization was only

granted under certain conditions, and that Respondent was only allowed to travel with E.R.G.

outside of Venezuela during pre-established dates and exclusively for the purpose of vacationing.

PX 02 at ZAORAL 011-12.

38.     Specifically, the Third Civil Court authorized the Travel Authorization on the

conditions that:

1.  Respondent left Venezuela with E.R.G. on July 6, 2018, and returned to Venezuela
    on August 14, 2018 (PX 02 at ZAORAL 012):

    **SECOND:** . . . [A]dolescent EVA GABRIELA RODRIGUEZ
    GODOY, thirteen (13) years old, with the following itinerary,
    departure on JULY 06, 2018 through ARUBA AIRLINES, flight
    AG112, departing from the Arturo Michelena International Airport
    located in the city of Valencia, with a stopover in Aruba and final
    destination MIAMI, UNITED STATES OF AMERICA, and return
    date on AUGUST 14, 2018 through the aforementioned airline
    ARUBA AIRLINES flight AG111, departing from MIAMI,
    UNITED STATES OF AMERICA, with a stopover in Aruba and
    final destination the Arturo Michelena International Airport located
    in the city of Valencia, Bolivarian Republic of Venezuela.

2.  Respondent and E.R.G. were also to appear before the Third Civil Court during the
    week of August 20 to August 24, 2018, following their return from Houston, Texas
    (PX 02 at ZAORAL 012):

    **FOURTH:** The compulsory appearance of the mother, JEYMORE
    GODOY MEZA, Venezuelan, of legal age, holder of the Identity
    Card No. V-12,394,385 IS ORDERED, in the company of the

- 7 -

aforementioned adolescent, between the hours of 08:30 AM and 03:30 PM during the week of 08/20/2018 to 08/24/2018.

39.     The Third Civil Court warned Respondent that failure to comply with the Travel

Authorization could be understood as international child abduction in violation of the Hague

Convention and could lead to prosecution for criminal offenses:

> **FIFTH**:  The mother, JEYMORE GODOY MEZA, Venezuelan, of
> legal age, holder of the Identity Card No. V-12,394,385 **HAS BEEN
> WARNED** about the fact that not complying with what has been
> ordered herein may be understood as child abduction, in accordance
> with the provisions of article 3 of the Approving Law of the
> Convention on the Civil Aspects of International Child Abduction,
> which could originate a complaint before the Public Prosecutor's
> Office for the criminal offense of contempt of court, provided for
> and sanctioned in article 272 of the LOPNNA, as well as the
> procedure related to international return, if applicable in the case.  It
> is ordered that this be fulfilled.

PX 02 at ZAORAL 014; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶¶ 29-30.

40.     Before July 6, 2018, E.R.G. was not aware that Respondent wanted to move to

Houston, Texas, with E.R.G.

41.     On July 6, 2018, Respondent and E.R.G. left Valencia, Venezuela, and traveled to

Houston, Texas.  Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 31.

42.     Respondent did not return E.R.G. to Venezuela on August 14, 2018, as ordered in

the Travel Authorization.  Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 32.

43.     On August 16, 2018, Petitioner, through legal counsel in Venezuela, filed a report

with the Public Ministry in Valencia, Venezuela, concerning Respondent's retention of E.R.G. in

Houston, Texas.  PX 07; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 34.

44.     Petitioner's complaint was referred to and addressed by the Third Civil Court, in

conjunction with the Venezuelan Public Prosecutor's Office in charge of protection of children

and adolescents.  PX 07; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 34.

45.     Respondent and E.R.G. did not appear before the Third Civil Court during the week of August 20 to August 24, 2018, as required by the Travel Authorization. Trial Tr. 139:12-19, July 28, 2020; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 35.

46.     On November 11, 2018, Petitioner submitted a Hague Convention Application to the Venezuelan Central Authority seeking the return of E.R.G. to Venezuela. PX 16; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 36.

47.     Petitioner's Hague Convention Application was transmitted from the Venezuelan Central Authority to the United States Central Authority on December 26, 2018. PX 16 at ZAORAL 193.

48.     On June 20, 2019, after exhausting his administrative remedies, Petitioner asked the Third Civil Court for a declaration of contempt of court against Respondent for violation of the Venezuelan court's Travel Authorization for Respondent. PX 08 at ZAORAL110–11; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 39.

49.     On September 18, 2019, the Third Civil Court directed the Venezuelan Family Law Public Prosecutor's Office to open an investigation regarding Respondent's non-compliance with the court's order, specifically with respect to the order that Respondent appear with E.R.G. before the court in August of 2018:

> Having the procedural minutes that make up this file been revised as they have been, and seeing the brief submitted by the citizen **ADRIAN RAUL RODRIGUEZ ZAORAL**, Venezuelan, of legal age, holder of the Identity Card No. V-12,607,538 on 06/20/2019 and the entry of Official Letter No. 19-01217 of the Administrative Service of Identification, Migration and Immigration (SAIME) dated 08/02/2019 and because the last address and the Migratory Data of the citizen **JEYMORE GODOY MEZA**, Venezuelan, of legal age, holder of the Identity Card No. **V-12,394,385**, *evidencing the lack of voluntary compliance with numeral Fourth of the sentence issued by this Court on 07/04/2018 by the citizen **JEYMORE GODOY MEZA**, previously identified*; in accordance with the norm contained in the constitutional and legal order, specifically the rights to

- 9 -

defense and due process, established in articles 26 and 49 of the Constitution of the Bolivarian Republic of Venezuela, and aimed to guarantee the correct application of the provisions of article 270 of the Organic Law for the Protection of Children and Adolescents which reads:

> "Anyone who prevents, hinders or fails to comply with the action of the Judicial authority, the Council for the Protection of Children and Adolescents or the prosecutor of the Public Prosecutor's Office, in the exercise of the functions provided for in this Law, shall be punished or sentenced to imprisonment from six months to two years."

> *Relying on the previous arguments, this Court agrees to notify the Family Law Public Prosecutor's Office of this Judicial District, for the purposes of requesting to open an investigation regarding the non-compliance of what was requested by this Court*; to that end, a certified copy of the judgment issued by this Court on 07/04/2018 on this file is attached, recorded under the No. GP02-V-2018-00453.

PX 10 at ZAORAL 161 (emphasis added).

50.     On September 19, 2019, the Third Civil Court issued a contempt order against Respondent for failing to comply with court orders relating to the Travel Authorization. PX 10 at ZAORAL 162; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 42.

51.     On October 23, 2019, the Public Prosecutor's Office initiated criminal proceedings against Respondent.   The criminal proceedings included a request for indictment against Respondent for offenses against the public order in the Criminal Judicial Circuit from the State of Carabobo from the Third State and Municipal Court of First Instance ("Third Criminal Court"). PX 11 at ZAORAL 167 (emphasis in original) ("[S]ummon [Respondent] for allegedly committing one of the OFFENSES AGAINST THE PUBLIC ORDER, to the detriment of the VENEZUELAN STATE, and as a third party affected the citizen ADRIAN RAUL RODRIGUEZ ZAORAL (other data reserved by the Public Prosecutor's Office), as a victim. . . .); Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 43.

52.     On October 29, 2019, the Third Criminal Court issued an order requiring Respondent to attend an indictment hearing on November 4, 2019, for offenses against the public order.  PX 12 at ZAORAL 172 ("[P]urpose of inform[ing] you that this Court **scheduled an INDICTMENT HEARING for 11/04/19 at 11:40 AM** initiated against the accused JEYMORE GODOY MEZA in the Case No. GP01- PM-2018-001272 for allegedly committing the crime of **OFFENSES AGAINST THE PUBLIC ORDER**.") (emphasis in original); Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 44.

53.     Respondent failed to attend the indictment hearing held on November 4, 2019, by the Third Criminal Court.  Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 45.

54.     On November 12, 2019, the Third Criminal Court formally issued an arrest warrant for Respondent for crimes against the public order.  PX 14; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 46.

> The purpose of this letter is to send you the Arrest Warrant No. **3CM-103-2019**, aimed at making it effective, issued against the indicted **JEYMORE GODOY MEZA, Venezuelan, HOLDER OF THE IDENTITY CARD No. V-12,394,385**.  Case No. GP01-PM-2019-001272, proceedings that are being conducted against her for the alleged commission of offenses **AGAINST THE PUBLIC ORDER**.

PX 14 (emphasis in original).

55.     On February 11, 2020, the Public Prosecutor's Office submitted a request to the Chief Commissioner, INTERPOL Carabobo Base for the inclusion of Respondent's Venezuelan arrest warrant in the INTERPOL notification system for the crime of contempt of the administration of justice for failing to comply with the Third Civil Court's orders.  PX 15; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 47.

> "I address you very respectfully to request what pertains to ordering the Injunction to the **SEARCH AND ARREST SYSTEM** (Preventive Detention) through the **INTERPOL** Notification

System - CODE I-24/7 for the purpose of Extradition of the citizen:
**JEYMORE GODOY MEZA**. . . ."

PX 15 at ZAORAL 189 (emphasis in original).

56.     On February 11, 2020, the Public Prosecutor's Office requested an INTERPOL

Order of Capture for Respondent, requesting that she be placed into INTERPOL's "Search and

Arrest" notification system, classifying her as "RED code for the purpose of Extradition of the

citizen . . . said citizen is in **CONTEMPT** of the **ADMINISTRATION OF JUSTICE**." PX 15;

Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 48. "Red Notices are issued

for fugitives wanted either for prosecution or to serve a sentence. A Red Notice is a request to law

enforcement worldwide to locate and provisionally arrest a person pending extradition, surrender,

or similar legal action."[1]

57.     Respondent is aware that there is an arrest warrant for her in Venezuela.

58.     Respondent is aware that the Venezuelan Public Prosecutor's Office has sought the

inclusion of her arrest warrant into the INTERPOL system and that if the INTERPOL order is

issued, the United States and its police will be obligated to locate her for the purposes of extradition

back to Venezuela.

59.     Since August 14, 2018, E.R.G. has remained in Houston with Respondent.  Joint

Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶¶ 32, 33.

60.     Respondent committed a civil and criminal offense by not complying with the terms

of the Third Civil Court's Travel Authorization and by engaging in international child abduction.

PX 02 at ZAORAL 012; PX 14.

---

[1] INTERPOL, Red Notices, interpol.inten/How-we-work/Notices/Red-Notices.

61.     Respondent was warned of and understood the consequences for violating the Travel Authorization and failing to return E.R.G. to Venezuela, which included being prosecuted for the criminal offense of contempt of court.  PX 02 at ZAORAL 012.

62.     Petitioner continues to financially support E.R.G. by regularly transferring funds to Respondent's Venezuelan bank account in compliance with the Fourth Court of First Instance's order while E.R.G. has been in Houston, Texas.  PX 22; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 50.

63.     Respondent did not inform Petitioner of E.R.G.'s current address in contravention of the Divorce Decree, which gave Petitioner the right to know in advance where Respondent and E.R.G. reside.  Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 59.

64.     Since Respondent has resided in Houston, Texas, the Parties' son Adrian Jr. has visited Respondent several times and returned to Valencia, Venezuela.

65.     E.R.G. does not believe living in Venezuela is intolerable, but she prefers to live in the United States:

> Q.     [The Court] And why did you decide not to return to Venezuela?
>
> A.     Because my mom and I saw that life was better here than there.  Trial Tr. 77:17:20, July 28, 2020.
>
> *        *        *
>
> Q.     [Ms. Wilkerson] And is it true that you prefer to live in the United States?
>
> A.     Very much so.  Trial Tr. 88:1-3, July 28, 2020.
>
> *        *        *
>
> Q.     [The Court] Did you intend at that time to return to Venezuela after the vacation?

A.   Yeah, [but] because we saw that the lifestyle here was better. When our vacation was almost over.  Trial Tr. 76:16-20, July 28, 2020.

\*       \*       \*

Q.   Do you mean by that it wouldn't be enough, that your lifestyle in Venezuela would not be as nice as your lifestyle has been in the United States?

A.   Yes ... Trial Tr. 87:3-6, July 28, 2020.

66.   E.R.G. confirmed that she would like to go back to Venezuela to visit if she could return to the United States.  Trial Tr. 87:24-25, July 28, 2020.

67.   After they arrived in Houston, Respondent and E.R.G. lived with the Respondent's sister, brother-in law, their two children, and Respondent's mother.

68.   E.R.G. speaks English, but she is not fluent in English.  Trial Tr. 11:17-12:7; 44:19-22, July 28, 2020.

69.   E.R.G. completed the eighth grade at Spring Oaks Middle School in Houston, Texas.  RX 6; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 55.

70.   E.R.G. was absent from class 15 times during the 2018-2019 academic school year and was late to class 25 times during the 2018-2019 academic school year.  RX 6.

71.   E.R.G. was enrolled at Stratford High School in Houston, Texas, for the 2019-2020 academic year.  Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 56.  She completed the ninth grade and maintained a 'B' average or better in all of her courses except biology.  RX 5.

72.   Because E.R.G. is not fluent in English, she was enrolled in two sheltered classes for English-language learners that provide additional support for students who are learning English.  RX 5.

73.     One of E.R.G.'s teachers, Ms. Elaine Sorsby, sometimes spoke to E.R.G. in Spanish in order to explain important points to her.  Ms. Sorsby testified that E.R.G. was a good student, asked for help when needed, and did not evidence any learning disabilities.

74.     After observing E.R.G. in court and considering the testimony of the witnesses, the court finds that E.R.G. does not currently suffer from a learning disability.  She presented as an alert, 15-year-old girl of average intelligence who was shy and somewhat nervous, possibly because of the adversarial courtroom setting.

75.     During the 2019-2020 academic year, before transitioning to online classes due to the COVID-19 pandemic, E.R.G. was absent from class 11 times and was late to class 26 times. RX 5.

76.     Because of the COVID-19 pandemic, E.R.G. attended classes online approximately two hours per day.

77.     This past academic year at Stratford High School, E.R.G. did not participate in extracurricular activities.

78.     E.R.G. volunteered at St. John Vianney Church in Houston, Texas, on the weekdays from June 11, 2020, to June 19, 2020, for three hours a day.   Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 58.  E.R.G. was not involved in any other activities outside of school.

79.     E.R.G. does not receive private tutoring in Houston, but Respondent sometimes helps her with her homework.

80.     E.R.G. has friends at school, but has no close friends in the United States.  She visits with her aunt and uncle, cousins, and grandmother who provide emotional support for her.

81.     Respondent provides health insurance for E.R.G., and E.R.G. receives medical care when needed.

82.     Respondent has a strong, supporting relationship with E.R.G..   Respondent provides for E.R.G.'s material needs and provides emotional support for her.

83.     Respondent has not provided Petitioner with E.R.G.'s educational records and has not informed Petitioner of the names of the schools E.R.G. has attended since being in Houston, Texas. Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶¶ 60-61.

84.     Respondent acknowledges that Petitioner is entitled to have access to E.R.G.'s educational records.

85.     Petitioner has not been provided with information relating to the identities of the medical providers that E.R.G. sees in the United States, nor has Respondent informed Petitioner of E.R.G.'s medical care or healthcare in the United States.   Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 62.

86.     For the past year Respondent and E.R.G. have resided with Respondent's mother at 1069 Country Place Drive, Houston, Texas 77079.  Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶¶ 51-53.

87.     This house is owned by Respondent's brother-in-law, Oscar Revollar, who rents the house to Respondent and her mother for $1,200 a month.  Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 54.

88.     Respondent works at a Randall's grocery store in Houston in the bakery department. Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 63.  Respondent works an average of 30 hours per week, making $12 an hour, and earns about $1,440 a month. Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 63.

89.     Respondent's monthly expenses include the rent ($600), electricity ($100), food ($300), phone payments ($50 or $60), medical insurance ($30), and gasoline ($80).  Trial Tr., 149:3-150:2, July 28, 2020.  This does not include other expenses, such as clothing for E.R.G., school supplies, funds for extracurricular and/or recreational activities, and emergency funds.

90.     Respondent and E.R.G.'s immigration status is unknown.  Although Respondent and E.R.G. are not lawful permanent residents of the United States, they are both authorized to work in the United States.  RX 3, RX 4.

## II.    CONCLUSIONS OF LAW

1.     The Convention on the Civil Aspects of International Child Abduction of October 24, 1980, ("Hague Convention" or "Convention") "secure[s] the prompt return of children wrongfully removed to or retained in any Contracting State" outside the country of the child's habitual residence and "ensure[s] that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States."  October 25, 1980, T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, reprinted in 51 Fed. Reg. 10494 (1986) ("Hague Convention" or "Convention")), Art. I (a)-(b).

2.     "The Convention shall apply to any child who was habitually resident in a Contracting State immediately before any breach of custody or access rights.  The Convention shall cease to apply when the child attains the age of 16 years."  Convention, Art. 4.

3.     The International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-9011 ("ICARA"), is the United States' implementing legislation for the Hague Convention.  22 U.S.C. § 9001(b)(1).

4.     ICARA establishes the procedures for implementing the Convention in the United States, with the goal of preventing and deterring parents involved in custody disputes from

using international child abduction from their home jurisdictions as a means for forum shopping. Abbott v. Abbott, 130 S. Ct. 1983 (2010).   ICARA therefore "empower[s] courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4) (emphasis added).

5.      The Hague Convention and ICARA are applicable in this case because on January 1, 1997, the Convention entered into force between the United States and Venezuela, making both contracting parties;[2] E.R.G. is a Venezuelan citizen who spent the first 13.5 years of her life in Venezuela, which is best suited to determine E.R.G.'s best interest and has decided custody matters related to E.R.G.; and E.R.G. is under 16 years of age.  PX 03 at ZAORAL 061; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 5.

6.      The fact that the Venezuelan Ministry of Foreign Affairs (the Venezuelan Central Authority for the Hague Convention) transmitted Petitioner's Hague Convention application to the U.S. State Department (the Central Authority for the Hague Convention in the United States) on December 26, 2018, which then accepted Petitioner's application, is further evidence that the Hague Convention applies in this case.  PX 16; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 36.  Pursuant to Article 27 of the Hague Convention, Central Authorities are not bound to accept applications if they conclude that an application is not well founded.

7.      This court has jurisdiction over this case under 22 U.S.C. § 9003(a) (jurisdiction under ICARA) and 28 U.S.C. § 1331 (federal question jurisdiction) because this case involves the wrongful retention and removal of a child under the age of sixteen from her habitual residence in Venezuela to the United States.  22 U.S.C. § 9003(b).

---

[2] U.S. Department of State, 1980 Hague Convention On the Civil Aspects of International Child Abduction, U.S. Hague Convention Treaty Partners (last visited June 14, 2020) https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html.

8.      Venue is proper under 22 U.S.C. § 9003 and 28 U.S.C. § 1391(b) because Respondent and E.R.G. are residing at 1069 Country Place Drive, Houston, Texas 77079, in the Houston Division of the Southern District of Texas.

**A.      E.R.G.'S Habitual Residence is Venezuela**

9.      In <u>Larbie v. Larbie</u>, 690 F.3d 295, 307 (5th Cir. 2012), the court explained the elements that the Petitioner must establish to support his action for wrongful removal under the Convention.

> The Convention uses the phrases "wrongful removal or retention" and "right of custody" as terms of art. A removal or retention is "wrongful" under the Convention when (1) "it is in breach of rights of custody attributed to a person ... under the law of the State in which the child was habitually resident immediately before the removal or retention; and" (2) "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Convention art. 3. The Convention considers "rights of custody [to] include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention art. 5(a). These rights differ from "rights of access," which "include the right to take a child for a limited period of time to a place other than the child's habitual residence." Convention art. 5(b).
>
> The Convention inquiry, then, consists of three elements, which the petitioner must establish by a preponderance of the evidence. <u>See</u> 42 U.S.C. § 11603(e)(1). First, the petitioner must show that the respondent removed or retained the child somewhere other than the child's habitual residence. <u>See, e.g.,</u> <u>Whiting v. Krassner</u>, 391 F.3d 540, 546–51 (3d Cir. 2004); <u>Mozes v. Mozes</u>, 239

- 19 -

F.3d 1067 (9th Cir.2002).   If so, the question becomes whether the removal or retention violated the petitioner's "rights of custody" under the habitual-residence nation's laws.   See, e.g., Fawcett v. McRoberts, 326 F.3d 491, 498–501 (4th Cir. 2003); Sealed Appellant v. Sealed Appellee, 394 F.3d 338, 343 (5th Cir. 2004). These rights need not be enshrined in a formal custody order issued before the removal or retention; the Convention also recognizes rights of custody that arise "ex lege." Explanatory Report at ¶ 68; see also Convention art. 3 ("The rights of custody mentioned ... above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State."). Assuming that the petitioner has rights of custody, she then need only make the final, and "relatively easy," Explanatory Report at ¶ 73, showing that "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Convention art. 3(b).   Generally, courts "'liberally find'" that rights of custody have been exercised unless evidence demonstrates "'acts that constitute clear and unequivocal abandonment of the child.'"   Sealed Appellant, 394 F.3d at 344–45 (citation omitted).

10.   The Fifth Circuit has "'adopted an approach that begins with the parents' shared intent or settled purpose regarding their child's residence." Larbie, 690 F.3d at 310 (citing Nicolson v. Pappalardo, 605 F.3d 100, 104 (1st Cir. 2010)).   This test examines "whether both parents intended for the child to 'abandon the [habitual residence] left behind.'" Larbie, 690 F.3d at 310–11 (citing Mozes, 239 F.3d at 1075) (emphasis added) (alteration in original).   "[W]hen 'the child's initial move from an established habitual residence was clearly intended to be for a

Case 4:20-cv-01700   Document 91   Filed on 08/26/20 in TXSD   Page 21 of 30


specific, limited duration[,] . . . most courts will find no change in habitual residence.'" <u>Larbie</u>, 690 F.3d at 311.

11.    As found above, E.R.G. was born in Valencia, Venezuela, and lived there for 13.5 years until her wrongful removal by Respondent. She attended a highly regarded private school in Venezuela, was engaged in extra-curricular activities at school and outside of school, and had close friends and family members in Venezuela.

12.    Although Respondent obtained permission from a Venezuelan court to bring E.R.G. to Houston, Texas, the Travel Authorization explicitly provided that E.R.G. could travel <u>solely</u> for the purposes of vacationing and ordered Respondent to return E.R.G. to Venezuela on August 14, 2018. PX 02 at ZAORAL 011-12. The Venezuelan court required Respondent to be present in court with E.R.G. the week after their scheduled return between August 20, 2018, and August 24, 2018. PX 02 at ZAORAL 012. The trip was clearly intended to be for a limited duration.

13.    The Travel Authorization makes it clear that the Venezuelan court and the Parties did not intend for E.R.G.'s place of residence in Valencia, Venezuela, to change because of E.R.G.'s trip to Houston. PX 02. Petitioner never acquiesced or consented to E.R.G.'s permanent removal from Venezuela. There is no evidence that "both parents intended for the child to 'abandon the [habitual residence] left behind.'" <u>Larbie</u>, 690 F.3d at 310-311 (citing <u>Mozes</u>, 239 F.3d at 1075). Valencia, Venezuela, was therefore the last residence of E.R.G. that was shared by both parents.

**B.    E.R.G.'s Removal Was in Breach of Petitioner's Rights of Custody.**

14.    Petitioner has established by a preponderance of the evidence that E.R.G.'s place of habitual residence is Valencia, Venezuela.

15.     The Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention, Art. 5(a).  If a non-custodial parent has the right to "determine the child's place of residence" in the parent's respective State, then that parent "has a right of custody" as required by the Convention and "may seek a return remedy."  Abbott, 130 S. Ct. at 1997.  "The term 'rights of custody' is to be broadly construed so as to bring as many cases as possible under the purview of the Convention."  Cartes v. Phillips, 240 F. Supp. 3d 669, 681 (S.D. Tex. 2017) (citing Abbott, 130 S. Ct. at 1993).  "The Petitioner is not required to have sole or exclusive custody over the child and, in fact, the Convention recognizes that custody rights can be 'decreed jointly or alone.'"  Cartes, 240 F. Supp. 3d at 681 (citing Abbott, 130 S. Ct. at 1990).

16.     Pursuant to the Parties' Divorce Decree, Respondent was required to "notify previously and in advance to [Petitioner] in case she decides to change her residence, for the purposes that [Petitioner] may fully exercise [his] rights and duties in relation to his daughter." PX 05 at ZAORAL 076.

17.     The Divorce Decree also stated that pursuant to a prior oral agreement between Respondent and Petitioner, Respondent would continue to have custody over E.R.G. on Tuesdays, every other weekend, and one-half of holiday vacations.  PX 05 at ZAORAL 073, 077, 077; Trial Tr. 127:4-16, July 28, 2020.  Petitioner also had a joint right of parental responsibility, which has as its "object the care, development and integral education of [E.R.G.]" and "will be exercised jointly by both parents, in interest and the adolescent."  PX 05 at ZAORAL 075.

18.     Petitioner has the "right of custody" under the Hague Convention and ICARA because Petitioner has the right to determine E.R.G.'s place of residence according to his joint custody agreement with Respondent, according to the Venezuelan Divorce Decree.  Convention,

- 22 -

Art. 5(a); Abbott, 130 S. Ct. at 1990-1995 (finding that if a non-custodial parent has the right to determine the child's place of residence in the parent's respective State, then that parent has a right of custody as required by the Convention and may seek a return remedy under the Convention as implemented by ICARA); PX 05 at ZAORAL 076.

19.     Petitioner has rights of custody of E.R.G. under Venezuelan law because he has the right to determine E.R.G.'s residence, a right to joint custody of E.R.G. on Tuesdays, every other weekend, and the joint right of Parenting Responsibility pursuant to a Venezuelan court decision. Petitioner has thus established by a preponderance of evidence that E.R.G.'s removal was in breach of his rights of custody.

**C.      Petitioner was Exercising His 'Rights of Custody' Prior to E.R.G.'s Abduction.**

20.     Petitioner can satisfy this element of the prima facie test by making the "relatively easy . . . showing that 'at the time of the removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.'" Larbie, 690 F.3d at 307 (citing Convention, Art. 3(b)). "Courts apply a liberal approach when determining whether rights of custody were actually being exercised." Gallardo v. Orozco, 954 F. Supp. 2d 555, 574 (W.D. Tex. 2013) (citing Sealed Appellant, 394 F. 3d at 344-45.

21.     Petitioner was exercising his right of custody before E.R.G.'s wrongful removal. Until E.R.G.'s abduction, Petitioner regularly spent time with E.R.G. and fulfilled his custody and parental obligations, including providing Respondent with food, money, and medical insurance for E.R.G. and paying E.R.G.'s school tuition. While E.R.G. was on what Petitioner believed to be a five-week vacation in Houston, Texas, Petitioner paid E.R.G.'s school fees for the 2018–2019 school year based on his expectation that E.R.G. would return as Respondent agreed and in compliance with the Venezuelan court order, and was eager for his only daughter to return home

and spend time with him and his family.  "[I]n the absence of a ruling from a court in the child's country of habitual residence, when a parent has custody rights under the laws of that country, <u>even occasional contact with the child constitutes 'exercise' of those rights</u>."  <u>Sealed Appellant</u>, 394 F.3d at 345 (emphasis added).  Petitioner never abandoned E.R.G.

22.     After E.R.G.'s abduction Petitioner has continued to exercise his custodial and parental rights by seeking E.R.G.'s return through Venezuelan courts and through the Hague Convention application process.  PX 7; PX 8; PX 10; PX 11; PX 12; PX 14; PX 15; PX 16. Petitioner also continues to provide financial support to E.R.G. even after her abduction by monthly depositing money to Respondent's Venezuelan bank account.  PX 22.

23.     Petitioner has proved by a preponderance of the evidence that he was exercising his custodial rights prior to E.R.G.'s wrongful removal.

**D.     Petitioner Has Established a Prima Facie Case for Relief Under the Convention.**

24.     Petitioner has established by a preponderance of the evidence that:  (1) Respondent unlawfully abducted E.R.G. from Venezuela; (2) Respondent's international abduction violated Petitioner's rights of custody under Venezuelan court orders; and (3) at the time of E.R.G.'s abduction, Petitioner was exercising his custody rights.  Petitioner has therefore met his burden of proving that E.R.G. was wrongfully removed and is entitled to a return remedy under the Convention and ICARA.

**E.     Because Petitioner Has Met His Burden to Establish the Prima Facie Case, the Burden Shifts to Respondent to Prove a Defense to Retain E.R.G. in the United States.**

25.     If the Petitioner shows by a preponderance of the evidence that the removal or retention of E.R.G. was wrongful, the burden shifts to the Respondent to prove any applicable affirmative defenses.  22 U.S.C. § 9003(e).

- 24 -

26.     Respondent must establish the following affirmative defenses by a preponderance of the evidence: (1) the non-removing parent was not exercising his rights of custody; (2) the child is of sufficient age and maturity, and objects to her return; and (3) the child is well-settled in the new environment. Respondent has not established the first defense because the court has found that Petitioner was exercising his rights of custody at the time of E.R.G.'s removal. The Respondent also asserts the mature child objection to removal and the well-settled defense. Proposed Findings of Fact and Conclusions of Law, Docket Entry No. 85, pp. 4-11. "The burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence." United States v. Wilson, 322 F.3d 353, 361 (5th Cir. 2003) (quoting Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California, 113 S. Ct. 2264 (1993)).

27.     Respondent must establish the following affirmative defenses under the heightened evidentiary standard of clear and convincing evidence: (1) the grave risk of physical and psychological harm; and (2) the fundamental principles relating to the protection of human rights and fundamental freedoms do not permit E.R.G.'s return (public policy defense). Respondent asserts both defenses. Clear and convincing evidence "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." Soto v. Contreras, 880 F. 3d 706, 711 (5th Cir. 2018) (internal quotations omitted) (citing In re Medrano, 956 F.2d 101, 102 (5th Cir. 1992)).

**F.      Respondent Has Not Established By a Preponderance of the Evidence Her Defense Based on the Mature Child Objection.**

28.      The Convention establishes that a court "may refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Convention, Art. 13.   The mature child exception therefore has two elements:  First, the court must determine whether E.R.G. is "of sufficient age and maturity" for the court to afford weight to E.R.G.'s preference, and second, whether E.R.G. actually objects to returning to her country of habitual residence.  Convention, Art. 13.  The mature child objection should "be applied narrowly." England v. England, 234 F.3d 268, 272 (5th Cir. 2000).

29.      E.R.G. is almost sixteen years old.  She is doing reasonably well in school and does not suffer from any learning disabilities or other impediments to her decision-making process.  At trial she did not affirmatively state that she "objects" to being returned to Venezuela or that returning would be intolerable.  The crux of her testimony is that she prefers to remain in the United States because she would enjoy a better lifestyle here.  But the weight to be afforded to her preference is undercut by the credible evidence that Petitioner would provide E.R.G. with food, clothing, medical care, family support, and a good education in Venezuela.  Therefore, even assuming that E.R.G.'s testimony can be considered as an "object[ion] to being returned" within the meaning of Article 13 of the Convention, the court concludes after considering her demeanor in court and the basis for her objection, that Respondent has failed to establish by a preponderance of the evidence that E.R.G. is sufficiently mature for the court to afford weight to her preference to remain in the United States.

- 26 -

### G.       The Well-Settled Defense is Not Available to Respondent.

30.       Article 12 of the Hague Convention provides that "where a child has been wrongfully removed or retained . . . and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith." Convention, Art. 12. When return proceedings are commenced more than one year after the date of wrongful removal, the court must also "order the return of the child, unless it is demonstrated that the child is now settled in its new environment." Hernandez v. Garcia Pena, 820 F.3d 782, 787 (5th Cir. 2016) (citing Convention, Art. 12).

31.       The well-settled defense in Article 12 does not apply if a party commences "proceedings before the judicial or administrative authority of the Contracting State where the child is" before "a period of less than one year has elapsed from the date of the wrongful removal or retention" (emphasis added). The term "administrative authority" is not defined in the Hague Convention.

32.       The ordinary meaning of "administrative authority" in the context of the Convention refers to a Central Authority of a Contracting State to the Convention. See Medellin v. Texas, 128 S. Ct. 1346, 1357 (2008) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text.").

33.       Article 6 of the Convention states that "[a] Contracting State shall designate a Central Authority to discharge the duties which are imposed by the Convention upon such authorities." The United States Department of State, Office of Children's Issues, performs the function of the Central Authority for the United States under the Convention. PX 17.

34.     E.R.G. was wrongfully retained in the United States when she did not return to Venezuela as scheduled on August 14, 2018. PX 02 at ZAORAL 012; July 28, 2020; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶¶ 32, 33.  On November 11, 2018, Petitioner submitted a Hague Convention Application to the Venezuelan Central Authority seeking the return of E.R.G. to Venezuela.  PX 16; Joint Pretrial Order, Parties' Admissions of Fact (ECF 53-01), at ¶ 36.  Petitioner's Hague Convention Application was transmitted from the Venezuelan Central Authority to the United States Department of State, Office of Children's Issues on December 26, 2018.  PX 16 at ZAORAL 193.  Because Petitioner commenced proceedings before the Central Authority of the United States -- the administrative authority where E.R.G. was located -- to secure the return of E.R.G. well before "a period of less than one year [had] elapsed from the date of wrongful . . . retention," the well-settled defense is not available to Respondent.

**H.     Respondent Cannot Prove That There is a Grave Risk of Harm to E.R.G. By Returning to Venezuela By Clear and Convincing Evidence.**

35.     "To meet her burden of defense under Article 13(b) of the Hague Convention defendant must show by clear and convincing evidence that there is a grave risk that return to [Venezuela] would expose the minor child to physical or psychological harm or place E.R.G. in an intolerable situation." Ibarra v. Quintanilla Garcia, 476 F. Supp. 2d 630, 636 (S.D. Tex. 2007).

36.     For grave risk of harm, "[t]he alleged harm 'must be a great deal more than minimal' and "greater than would normally be expected on taking a child away from one parent and passing him to another." Madrigal v. Tellez, 848 F.3d 669, 676 (5th Cir. 2017) (quoting Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000)).  To prevail on this defense Respondent must prove that the risk to E.R.G. is grave, not merely serious.  Soto, 880 F.3d at 710.

37.     Respondent has not proved by clear and convincing evidence that there exists a grave risk that return to Venezuela would expose E.R.G. to physical or psychological harm or

place her in an intolerable situation.  Both Respondent and E.R.G. testified that Petitioner never physically abused E.R.G.:

> Q.     [The Court] Did your father ever do anything bad to you in Venezuela?
>
> A.     Umm, no.  Trial Tr. 76:7-9, July 28, 2020.
>
>        \*   \*   \*
>
> Q.     [The Court] Did your husband every strike, or hit [E.R.G.]?
>
> A.     Not physically . . . .  Trial Tr. 162:12-15, July 28, 2020.

Respondent claims that Petitioner psychologically abused E.R.A., but when asked by the court if she told the Venezuelan court about Petitioner's alleged abuse, she testified that she did not report the alleged abuse.  This uncorroborated claim that the Petitioner "verbally mistreated" E.R.G. does not rise to the level of a grave risk of harm.

38.     Respondent also argues that E.R.G. would be unsafe if she were required to return to Valencia.  But the credible evidence establishes that she would receive food, clothing, medical care, family support, and a good education and would reside with Petitioner in a protected environment.

39.     Respondent has failed to prove by clear and convincing evidence that there is a grave risk that returning E.R.G. to Venezuela would expose her to physical or psychological harm or place E.R.G. in an intolerable situation.

**I.     Respondent Cannot Establish Her Public Policy Defense By Clear and Convincing Evidence.**

40.     Under Article 20 of the Hague Convention, the court need not order the return of a child if the respondent shows, by clear and convincing evidence, that return "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."  Hague Convention, Art. 20.  This defense "'is to be invoked

only on 'the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process.'" <u>Monroy v. de Mendoza</u>, Civil Action No. 3:19-CV-1656-B, 2019 WL 5204832, at *2 (N.D. Tex. Oct. 16, 2019) (citing <u>Souratgar v. Lee</u>, 720 F.3d 96, 108 (2d Cir. 2013) (quoting U.S. State Dep't, <u>Hague International Child Abduction Convention:  Text and Legal Analysis</u>, Pub. Notice 957, 51 Fed. Reg. 10494, 10510 (March 26, 1986)).  The defense is to be "restrictively interpreted and applied." <u>Souratgar</u>, 720 F.3d at 108.  Agreed Applicable Propositions of Law, Exhibit 4 to Joint Pretrial Order, Docket Entry No. 53-4, pp. 8-9.

41.     Respondent has not proved by clear and convincing evidence that returning E.R.G. to her home in Venezuela would utterly shock the conscience of the court or offend due process. E.R.G. would return to her family in Valencia and continue to receive material and emotional support from Petitioner and her other family members.  The facts of this case provide no support for the application of this defense.

## III.   <u>CONCLUSION</u>

If any finding of fact should more properly be characterized as a conclusion of law, it is hereby adopted as a conclusion of law.  If any conclusion of law should more properly be characterized as a finding of fact, it is hereby adopted as a finding of fact.

Although Petitioner has requested an award of attorney's fees, Respondent has no means of paying an award of attorney's fees in addition to the costs that will be taxed against her. Moreover, allowing additional briefing and evidence on attorney's fees would needlessly delay the final resolution of the case.  The court will therefore not award attorney's fees to Petitioner.

**SIGNED** at Houston, Texas, on this the **26th** day of August, 2020.

SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE